Lloyd MESSERLI, Petitioner,

v.

STATE of Alaska, Respondent.

No. 4326.

Supreme Court of Alaska.

Nov. 28, 1980.

Rehearing Denied April 6, 1981.

Nancy R. Gordon, Josephson & Trickey, Inc., Anchorage, on behalf of Alaska Civil Liberties Union, for petitioner.

Patrick R. Gullufsen, Asst. Atty. Gen., Avrum M. Gross, Atty. Gen., Juneau, for respondent.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

DIMOND, Senior Justice.

Lloyd Messerli placed in the *Anchorage Times* and the *Anchorage Daily News* two identical advertisements which sought to influence the citizens of the Municipality of Anchorage in their votes on certain municipal bond propositions. A copy of the advertisement is attached to this opinion.

Under the Alaska Campaign Disclosure Act, AS 15.13.010–.130, Messerli was required to file a written report, which would be available for public inspection, containing (1) his name, address, principal occupation, type of business engaged in, and the name of his employer; (2) any expenditure he made in favor of or against a particular named ballot proposition, including the amount, date and check number, and the name and address of the payee to whom the expenditure was made, and (3) the purpose of the expenditure, *i. e.,* radio, brochures, newspaper advertising, et cetera.[1]

Messerli refused to make and file this report, and was prosecuted by the state for a violation of the Act, a misdemeanor.[2] He claimed that enforcement of the Act in this instance would violate his right to free speech and invade his privacy. His motion to dismiss the prosecution on these grounds was denied by the district court. A petition for review to the superior court was also denied.

Messerli has petitioned this court for review. We grant the petition because of the important constitutional questions involved, and because it would be an exercise of futility to require Messerli to go back to the district court where he would be convicted of the misdemeanor (he readily admits he refused to file the report), and then appeal to the superior court which has already ruled against his legal defense, and finally to appeal in the regular manner to this court.[3]

---

1. The pertinent provisions of the Act, as they relate to Messerli, are AS 15.13.040(d) and (e), which provide:

   (d) Every individual, person or group making a contribution or expenditure shall make a full report, upon a form prescribed by the commission, of the following contributions of expenditures:

   (1) any contribution of cash, goods or services valued at more than $100 a year to any group or candidate; or

   (2) any expenditure whatsoever for advertising in newspapers, on radio or on television; or, for the publication, distribution or circulation of brochures, flyers, or other campaign material for any candidate or ballot proposition or question.

   (e) The report required under (d) of this section shall contain the name, address, principal occupation and employer of the individual filing the report, and an itemized list of expenditures. The report shall be filed with the commission by the contributor no later than 10 days after the contribution or expenditure is made. A copy of the report shall be furnished to the candidate, campaign treasurer or deputy campaign treasurer at the time the contribution is made.

   An "expenditure" is defined in AS 15.13.-130(4) as

   a purchase or a transfer of money or anything of value, or promise or agreement to purchase or transfer money or anything of value, incurred or made for the purpose of ... (D) influencing the outcome of a ballot proposition or question ....

2. The criminal sanctions against those who violate the Act are provided in AS 15.13.120(a), which states in pertinent part:

   A person who violates a provision of this chapter is guilty of a misdemeanor and, upon conviction, is punishable by imprisonment for not more than one year or by a fine of not more than $5000. A violation includes but is not limited to any of the following acts or omissions:

   (1) failing to make a statement or report required to be made under this chapter, or failing to make a statement or report at the time the statement or report is required to be made under this chapter ....

3. Appellate Rule 23(e) provides for interlocutory review of an order or decision of the superior court

   [w]here postponement of review until normal appeal may be taken from a final judgment will result in injustice because of impairment of a legal right, or because of unnecessary

AS 15.13.010(b) makes the reporting requirements of the act applicable to ballot propositions:

Except as otherwise provided, this chapter applies to contributions, expenditures and communications made by a candidate, group, municipality or individual for the purpose of influencing the outcome of a ballot proposition or question as well as those made to influence the nomination or election of a candidate.

Governmental abridgment of the right to free expression, by speech or by writing, is forbidden by the first amendment to the United States Constitution. It is provided there that

Congress shall make no law ... abridging the freedom of speech, or of the press

. . . .

This provision has been made applicable to state governmental action by the fourteenth amendment to the federal constitution.[4]

The Alaska Constitution also protects free speech, but in a more explicit and direct manner. Article I, section 5, provides:

Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.

There is also a right to privacy in the federal constitution, which is derived from a broad reading of the due process clause of the fourteenth amendment, or other federal constitutional provisions.[5] But again, the constitutional right to privacy in the Alaska Constitution is explicit and direct. Article I, section 22, provides in part:

The right of the people to privacy is recognized and shall not be infringed.

We have held that this express right to privacy is broader than that afforded by the United States Constitution.[6]

In expressing the rights to free speech and privacy, the framers of our constitution appear to have recognized a right of universal freedom and a right to be left alone which is rooted in the natural inclination of human beings.[7] But these rights, in a free society such as ours, have never been recognized as absolute and without limitations. As Professor Bodenheimer points out:

It has been the experience of free societies that all liberties are liable to abuse by unscrupulous individuals and groups, and that they must therefore be subjected to certain restraints in the interest of the public weal.[8]

Because of this, it is a function of this court to create a workable equilibrium and synthesis between the two polar ideas of freedom and authority.[9]

In effect, there must be here a balancing of conflicting rights and interests. On the one hand, we have the express and unambiguous constitutional rights of free speech and privacy, which on their face would appear to admit of no exceptions [10] and which would prevent any restrictions by the legislature. On the other hand, we can envision an interpretation of these constitutional provisions which would allow the legislature, without any manifest need, to restrict or suspend these constitutional rights by a simple reference to the public interest. We cannot accept the latter, because then the constitutional guarantees would have little or no meaning. We also cannot accept the former, which may be referred to as libertarian absolutism, because absolute freedom of speech and absolute privacy in all situations and on all occasions would in certain instances be incompatible with the preservation of other rights essential in a democracy.

---

delay, expense, hardship or other related factors.

4. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

5. *See Carey v. Population Services Int'l,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

6. *Woods & Rhode, Inc. v. State, Dept. of Labor,* 565 P.2d 138, 149 (Alaska 1977); *Ravin v.*

*State,* 537 P.2d 494, 514–15 (Alaska 1975) (Boochever, J., concurring).

7. *See* E. Bodenheimer, Jurisprudence 202 (1967).

8. *Id.* at 203.

9. *Id.* at 203.

10. This is not entirely accurate, because those who exercise the right of free speech are, in the words of article I, section 5, of the state constitution, "responsible for the abuse of that right." This provision, however, is not pertinent to the discussion in this case.

The balance we reach in weighing these two conflicting interpretations is found in a former decision of this court, *Breese v. Smith*, 501 P.2d 159 (Alaska 1972). In that case, a boy was expelled from school because his hair was longer than that permitted by school regulation. We determined that one's natural right to liberty, specifically recognized in article I, section 1, of the Alaska Constitution,[11] encompassed "the fundamental personal right of students in our public schools to select their own individual hair styles without governmental direction."[12] However, we held that such right of liberty is not absolute, and there may be occasions when governmental intervention or regulation would be permissible. In achieving a balance between the individual's right to liberty and society's right to impose some limitation on individual liberty, we established the following rule:

> Once a fundamental right under the constitution of Alaska has been shown to be involved and it has been further shown that this constitutionally protected right has been impaired by governmental action, then the government must come forward and meet its substantial burden of establishing that the abridgment in question was justified by a compelling governmental interest.[13]

We further stated that we thought the "adoption of the compelling interest standard best comports with the kind of ordered liberty which represents the core of Alaska's constitutional heritage."[14]

That is the test we apply in this case.[15] The question is whether the state has sustained its substantial burden of establishing that the impairment of Messerli's right to publish freely, by subjecting him to the reporting and disclosure requirements we have mentioned, is justified by a compelling governmental interest. The state does not dispute the existence of a burden on Messerli in being subject to the disclosure and reporting requirements of the Alaska Campaign Disclosure Act. However, it contends that the burden is valid because such requirements further a compelling public interest.

In making this argument, the state relies to a large extent on the case of *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), where the United States Supreme Court sustained the reporting requirements of the Federal Election Campaign Act[16] against the challenge that the statute abridged freedom of speech contrary to the first amendment to the United States Constitution. A portion of the opinion sustaining the compelled disclosure of information under the federal act is of interest here. The Supreme Court said:

> First, disclosure provides the electorate with information "as to where political campaign money comes from and how it is spent by the candidate" in order to aid the voters in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office.

---

**11.** Article I, section 1, of the Alaska Constitution provides:

> *Inherent Rights.* This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities, and protection under the law; and that all persons have corresponding obligations to the people and to the State.

**12.** *Breese v. Smith*, 501 P.2d 159, 169 (Alaska 1972) (footnote omitted).

**13.** *Id.* at 171.

**14.** *Id.* at 172.

**15.** We are concerned with "freedom" as it pertains to speech, writings and publications. *Breese* involved a determination of what the word "liberty" encompassed. We regard the two terms as synonymous in this context, and thus use them interchangeably. *See* The American Heritage Dictionary of the English Language 524 (1970).

**16.** 2 U.S.C.A. §§ 431–455; 18 U.S.C.A. §§ 600–607 (Cum.Supp.1977).

Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. This exposure may discourage those who would use money for improper purposes either before or after the election. A public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return. And, as we recognized in *Burroughs v. United States* . . . , Congress could reasonably conclude that full disclosure during an election campaign tends "to prevent the corrupt use of money to affect elections." In enacting these requirements it may have been mindful of Mr. Justice Brandeis' advice:

"Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman."

Third, and not least significant, recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations described [elsewhere in the *Buckley* opinion].[17]

The Court announced the test it would require disclosure provisions to pass to stand constitutional muster:

We have long recognized that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest. Since [*NAACP v. Alabama*, 357 U.S. 449 [78 S.Ct. 1163], 2 L.Ed.2d 1488 (1958)] we have required that the subordinating interests of the state must survive exacting scrutiny. We have also insisted that there be a "relevant correlation" or "substantial re-

lation" between the governmental interest and the information required to be disclosed.[18]

We have difficulty in this case with a blanket adoption of *Buckley*. First of all, the danger of corruption in a political campaign simply does not exist in a situation where people vote on a bond proposition. In the case of *First National Bank v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707, *reh. denied*, 438 U.S. 907, 98 S.Ct. 3126, 57 L.Ed.2d 1150 (1978), the United States Supreme Court was concerned with a ballot issue regarding a referendum. At one point, the Court stated:

The risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue.

435 U.S. at 790, 98 S.Ct. at 1423, 55 L.Ed.2d at 726 (footnote and citation omitted). Secondly, we believe that an expenditure for influencing the outcome of a ballot proposition or question comes far closer to pure political speech than does an expenditure advocating the election or defeat of a particular candidate. An individual's right of expression in the latter circumstances consists of giving the candidate funds to convey the candidate's message to the public. But in ballot proposition contests, the message is often the contributor's own. The contributor exercises the right of free speech directly on his own behalf, addresses whatever he sees as the merits of an issue, expresses his own opinions, and makes his own recommendations to the public.

This is the essence of political speech. As we noted in *Alaska Gay Coalition v. Sullivan*, 578 P.2d 951 (Alaska 1978), "It is axiomatic that freedom of speech and the correlative freedom of association are fundamental rights which lie at the foundation of our system of government."[19] In *Sullivan*, we noted the United States Supreme Court's pronouncement in *Cohen v. Califor-*

---

17. *Buckley v. Valeo*, 424 U.S. 1, 66–68, 96 S.Ct. 612, 657–658, 46 L.Ed.2d 659, 715 (1976) (footnotes and citation omitted).

18. *Id.* at 64, 96 S.Ct. at 656, 46 L.Ed.2d at 713 (footnotes and citation omitted).

19. *Alaska Gay Coalition v. Sullivan*, 578 P.2d 951, 959 (Alaska 1978).

*nia*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), that

> [t]he constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests.[20]

The disclosure requirements in this case unquestionably impose a restraint upon Messerli's right of expression. Ballot propositions in this state quite frequently involve extraordinary issues of the most sensitive and divisive type, whether in statewide or local elections. It is quite probable that one who advocates an unpopular position would be most reluctant to exercise his right of free speech if his name, address, occupation and employer will become a matter of public record, as they would here.

The disclosure requirements of the Act also place a substantial burden upon Messerli's right of privacy afforded him by article I, section 22, of the Alaska Constitution. As a requirement of exercising his opinion on a political question, Messerli was required to reveal his name, address, occupation, employer, and the amount of his expenditure. For failure to do this, he was prosecuted. Furthermore, disclosure of this information could lead to harassment or economic reprisals by readers, or even by an employer who did not want his name associated with particular issues.

▇ It is true that the right to privacy, similar to the right to liberty and the right freely to speak, write and publish on all subjects, is not absolute. *See Falcon v. Alaska Public Offices Commission*, 570 P.2d 469, 476 (Alaska 1977). But such rights

may not be abridged by governmental action unless the government meets its substantial burden of establishing that an abridgment of any such right is justified by a legitimate and compelling governmental interest. Whether such an interest exists in a case of the kind we have here must now be considered.

In support of the proposition that such an interest is present in this case, the state contends:

> One of the most accurate measures of the intent underlying a particular proposition and its probable or intended effect is the price a group or individual is willing to put on it (or against it). Disclosure of the source and the amount of media expenditures directed towards a ballot proposition *at least* gives the electorate a broader perspective and better enables an intelligent assessment of the merits or demerits of the question.

The effective functioning of our democratic form of government is premised on an informed electorate. When citizens vote on the basis of misinformation, or a lack of relevant information, the decision-making process on which our government ultimately rests suffers to that extent.

The legitimacy of the state's interests in creating an informed electorate has received increasing acknowledgement in recent years by the United States Supreme Court with respect to the first amendment to the federal constitution. In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Court upheld the disclosure requirements of the Federal Election Campaign Act of 1971 in part because of this goal, and referred to "[t]he Government's interest in deterring the 'buying' of elections and the undue influence of large contributors." 424 U.S. at 70, 96 S.Ct. at 659, 46 L.Ed.2d at 717. In *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the Court held that the regulation of broadcasters under the

---

**20.** *Id., quoting Cohen v. California*, 403 U.S. 15, 24, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284, 293 (1971).

fairness doctrine justified infringement of the broadcaster's personal right to free expression. In so holding the Court referred to "the First Amendment goal of producing an informed public capable of conducting its own affairs." 395 U.S. at 392, 89 S.Ct. at 1807, 23 L.Ed.2d at 390. In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Court, in limiting defamation actions brought by public officials, stressed the first amendment objective of securing " 'the widest possible dissemination of information from diverse and antagonistic sources.' " 376 U.S. at 266, 84 S.Ct. at 718, 11 L.Ed.2d at 698 (citations omitted).

The need for an informed electorate applies with full force to ballot issues. Such issues are often complex and difficult to understand. Proper evaluation of the arguments made on either side can often be assisted by knowing who is backing each position.[21] We have long recognized in court proceedings the importance of revealing to the decision maker the biases and motives of witnesses.[22] Such information is no less important to an intelligent evaluation of what is being said during an election campaign. Similarly, a ballot issue is often of great importance financially to its proponents or opponents, or both, and multi-million dollar advertising campaigns have been waged. In such circumstances the voter may wish to cast his ballot in accordance with his approval, or disapproval, of the sources of financial support. What the Supreme Court of the United States said in *United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954), in upholding the constitutionality of the disclosure provisions of the Federal Lobbying Act is equally pertinent here:

> [T]he voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal. This is the evil which the Lobbying Act was designed to help prevent.

Toward that end, Congress ... has merely provided for a modicum of information from those who for hire attempt to influence legislation.... It wants only to know who is being hired, who is putting up the money, and how much. It acted in the same spirit and for a similar purpose in passing the Federal Corrupt Practices Act—to maintain the integrity of a basic governmental process.

347 U.S. at 625, 74 S.Ct. at 815, 98 L.Ed. at 1000–01 (footnote and citation omitted).

In a case more recent than *Buckley*, the Supreme Court of the United States has indicated in unmistakable terms that state disclosure laws pertaining to ballot issues are constitutional. In the case of *First National Bank v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), which we have referred to earlier in this opinion, the Court struck down a Massachusetts law which prohibited corporations from communicating their views to the public on ballot questions, except as to certain questions materially affecting their business. In rejecting the "highly paternalistic" approach of the statute, the Court stated:

> [T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments. They may consider, in making their judgment, the source and credibility of the advocate.

435 U.S. at 791–92, 98 S.Ct. at 1423–24, 55 L.Ed.2d at 727–28 (footnotes omitted). In a footnote to this statement, the Court said in part:

> Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected.... In addition, we emphasized in *Buckley* the prophylactic effect of requiring that the source of communication be disclosed.

435 U.S. at 792 n. 32, 98 S.Ct. at 1424 n. 32, 55 L.Ed.2d at 728 n. 32 (citations omitted).

---

21. *See generally* S. Lyndenberg, Bankrolling Ballots: The Role of Business in Financing State Ballot Question Campaigns (1978) (report by Council on Economic Priorities).

22. *See* Alaska R. Evid. 613; 3A J. Wigmore, Evidence §§ 943–69 (Chadbourn ed. 1970).

Respected authorities have recognized that the objective of an informed electorate is sufficiently compelling to overcome the interest in anonymous political expression. Professor Tribe, in his text on American Constitutional Law, proposes:

Most states impose some requirement that the author or sponsor of campaign literature be identified. These disclosure laws are obviously troublesome in that some authors might be unwilling to disseminate their views if required to identify themselves in the process. But the risk that free expression will be chilled must be offset by the two major interests that such laws advance: deterring the defamation of candidates (and the possible further harm of discouraging candidacy), and enabling voters to assess campaign literature more accurately. The interest in preventing candidate defamation is certainly significant, but it seems achievable by the less restrictive alternative of enforcing campaign falsity statutes. The interest in providing voters with information that will permit them better to assess campaign literature, on the other hand, is not so readily protected by other means. As a general proposition, therefore, carefully drafted campaign literature disclosure laws should probably be deemed constitutionally permissible.

L. Tribe, American Constitutional Law §§ 13–26, at 799 (1978) (footnotes omitted). Recent Notes in the Cornell[23] and the Harvard[24] Law Reviews arrive at similar conclusions.

There will, of course, be exceptions to the necessity for there being an informed electorate in all cases. For example, the Court in *Buckley* suggested that judicially made *ad hoc* exceptions to disclosure laws could be fashioned when there is a showing of a pattern of threats or reprisals or specified manifestations of public hostility. Such exceptions would serve to protect the right to anonymous political expression.

Where it exists the type of chill and harassment identified in [*NAACP v. Alabama*, 357 U.S. 449 [78 S.Ct. 1163], 2 L.Ed.2d 1488, (1958)] can be shown. We cannot assume that courts will be insensitive to similar showings when made in future cases.

424 U.S. at 74, 96 S.Ct. at 661, 46 L.Ed.2d at 719.

It is difficult for the judiciary to fashion the general rule which will strike a fair balance between the competing interests of an individual's right to anonymity, on the one hand, and on the other, the need for the public to be fully informed as to those who express their interests in ballot propositions. We could determine this problem on a case-by-case basis, as suggested in *Buckley*, but we believe that this would be extremely burdensome for the parties involved and also for the courts.

■ AS 15.13.030 requires the Alaska Public Offices Commission to adopt regulations necessary to implement and clarify the provisions of chapter 13 of the Alaska statutes dealing with state election campaigns.[25] Chapter 13 contains the statutes relating to this case. We believe that a determination of those individuals who must remain anonymous with respect to advertising as to ballot propositions because of the possibility of their being subject to reprisals, economic or otherwise, can best be accomplished, at least initially, by means of regulations adopted by the Commission, with the safeguards and opportunity for public participation provided by the Alaska Administrative Procedure Act.[26]

23. Note, *The Constitutionality of Financial Disclosure Laws*, 59 Cornell L.Rev. 345, 362 (1974).

24. Developments in the Law, *Elections*, 88 Harv.L.Rev. 1111, 1291 (1975).

25. AS 15.13.030 provides in relevant part: The commission shall . . .

(10) adopt regulations necessary to implement and clarify the provisions of . . . this chapter [Ch. 513, Title 15, Alaska Statutes], subject to the provisions of the Administrative Procedure Act (AS 44.62).

26. *See Falcon v. Alaska Public Offices Comm'n*, 570 P.2d 469, 480 (Alaska 1977).

In the case at hand, Messerli placed his name, together with his telephone number, in the advertisements he purchased. But since this case came up on a motion to dismiss and there was no evidence introduced, we do not have any way of knowing to what extent, if any, Messerli might have been deterred by threats or reprisals from divulging his address, his occupation, and the name of his employer. These matters ought to be determined before a final decision is made in this case, and therefore the case will be remanded for the purpose of gathering evidence on such matters.[27] On the face of the bare record before us, it appears that Messerli did violate the terms of the pertinent statute regarding divulging certain information in placing advertisements in a newspaper. But we must note that Messerli apparently brought this case as a test case, and that this is one case which needed to be brought. In these circumstances, any sanction which the district court may impose after determining the matters which we have stated call for remand of the case should be minimal.

The case is REMANDED to the district court for further proceedings consistent with the views expressed in this opinion.

BURKE, J., dissents.

BOOCHEVER, J., not participating.

BURKE, Justice, dissenting.

I respectfully dissent.

At the time of the Alaska Constitutional Convention, delegate Fischer expressed concern about the language of Article I, Section 5. He asked his fellow delegates, "I wonder if the statement in this sentence might not open this up to an infringement of freedom of speech through legislation by indirect means?" 2 Proceedings of the Alaska Constitutional Convention, 1305 (January 5, 1956). Delegate Fischer's question has now been answered. The answer, unfortunately, is "yes."

In language that the majority itself calls "express and unambiguous," Article I, Section 5, guarantees to every person in Alaska the right to "freely speak, write and publish on all subjects, being responsible for the abuse of that right." Absent some evidence of abuse, I fail to agree that Messerli can be punished for his refusal to report the additional information required by the Alaska Campaign Disclosure Act. That requirement, as I see it, directly infringes upon the right guaranteed him by Article I, Section 5, without compelling justification.

The majority justifies its holding under the same rationale used by the United States Supreme Court in upholding similar reporting requirements under the First Amendment. That rationale, I believe, is faulty in several respects.

The most important of these is that it ignores both the history of our own country and the role that anonymous expression has played in the progress of mankind. "Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all." *Talley v. California,* 362 U.S. 60, 64, 80 S.Ct. 536, 538, 4 L.Ed.2d 559, 563 (1960). Moreover, "it is plain that anonymity has sometimes been assumed for the most constructive pur-

---

27. The record shows that Messerli was in partial compliance with the statute. This is some-

thing the district court ought to take into account in finally disposing of this case.

poses." 362 U.S. at 65, 80 S.Ct. at 539, 4 L.Ed.2d at 563.[1]

---

**1.** The importance of anonymous political expression in this country is amply demonstrated by the debates that surrounded the ratification of the proposed Constitution following the Constitutional Convention in 1787. The chief proponent, Alexander Hamilton, first wrote under the pseudonym "Caesar." Later, Hamilton, James Madison and John Jay published the Federalist Papers under the collective pseudonym "Publius." Their main adversary, Governor George Clinton of New York, wrote under the name "Cato." These men were fortunate indeed that they did not have to contend with an act like the Alaska Campaign Disclosure Act. Had that been the case, they probably would have been prosecuted, since it is unlikely that any of them would have complied with its provisions. More importantly, however, our nation and the world might have been deprived of their ideas.