WINFREE, Justice.
I. INTRODUCTION
Like the United States Constitution, the Alaska Constitution generally guarantees citizens the right to free speech without governmental infringement. Defining speech broadly, *1033 as does the United States Supreme Court with respect to the federal constitution, we have held that the Alaska free speech clause protects nude dancing as a form of expression. In this case an adult cabaret featuring nude dancing challenges a municipal code provision prohibiting adult-oriented establishments from operating during early morning hours, arguing that if the provision applies to adult cabarets, it is unconstitutional under the federal and Alaska constitutional free speech provisions.
We conclude that the current municipal closing-hours restriction applies to adult cabarets, but, applying strict scrutiny, that it may not be enforced against adult cabarets in light of the Alaska Constitution's free speech clause. We leave open the possibility that local governments may enact constitutional closing-hours restrictions for adult cabarets, but we must prohibit enforcement of this particular restriction because the municipal assembly failed to appropriately justify its imposition.
II. FACTS AND PROCEEDINGS
Club SinRock, LLC operates an adult cabaret featuring fully nude dancing. Because SinRock does not serve alcohol, the Municipality of Anchorage licenses and regulates it under the Anchorage Municipal Code (AMC) as an adult-oriented business.[1] Since 2007 SinRock has received adult-oriented establishment licenses from the Municipality.
In January 2016 the Municipal Clerk received a complaint that SinRock was violating AMC 10.40.015(A), mandating that adult-oriented establishments close between 2:00 a.m. and 6:00 a.m., by staying open until 4:00 a.m. SinRock's owner acknowledged that the club regularly remains open past 2:00 a.m., and the Clerk determined that SinRock was violating the closing-hours restriction. In March, after SinRock's owner applied for a license renewal, the Municipal Clerk issued a notice stating that SinRock's license would be conditionally renewed "provided that [it] abides by the provisions of the Municipal Code."
SinRock challenged the Municipal Clerk's decision, and the Municipality held administrative hearings in March and September. SinRock argued that, based on the ordinance's legislative history, the closing-hours restriction does not apply to adult cabarets and that applying the restriction would create a conflict with another municipal code section prohibiting adult-oriented establishments from intentionally exposing genitals to business invitees. SinRock also argued that the closing-hours restriction violates its free speech rights under the United States and Alaska Constitutions. In October a hearing officer determined that she had no authority to decide SinRock's constitutional claims and recommended the Municipality conclude that the closing-hours restriction applies to adult cabarets, that Sinrock violated the restriction, and that no conflict exists in the code provisions (but also that any potential conflict did not need to be decided). The Municipal Clerk adopted the recommendations a few days later.
SinRock appealed to the superior court, and in March 2018 the superior court affirmed the Municipal Clerk's decision. The superior court concluded that the ordinance's plain language and legislative history indicate the closing-hours restriction applies to adult cabarets. The court also concluded that any potential conflict with the ordinance prohibiting genital exposure-a prohibition the Municipality was not seeking to enforce-does not mean the closing-hours restriction was impliedly repealed or otherwise unenforceable; the court noted that any potential conflict is not relevant to deciding this case. And the court concluded that the closing-hours restriction does not violate SinRock's free speech rights under either the United States or Alaska Constitution.
SinRock appeals, arguing that the superior court erred by determining that the closing-hours restriction applies to adult cabarets or, *1034 alternatively, by holding that the restriction is constitutional under the federal and Alaska constitutional free speech provisions.
III. STANDARD OF REVIEW
"When the superior court has acted as an intermediate court of appeal, we review the merits of the administrative agency's decision without deference to the superior court's decision."[2] When "statutory interpretation does not involve agency expertise, or the agency's specialized knowledge and experience would not be particularly probative," we substitute our own judgment and review de novo.[3] "Questions of constitutional interpretation are also reviewed de novo under the substitution of judgment standard."[4]
" 'Ordinary principles of statutory interpretation apply' to municipal ordinances."[5] We therefore interpret municipal ordinances "according to reason, practicality, and common sense, considering the meaning of the [ordinance's] language, its legislative history, and its purpose."[6] "We 'use a sliding scale approach ... in which "the plainer the [ordinance's] language is, the more convincing the evidence of contrary legislative purpose or intent must be." ' "[7]
IV. DISCUSSION
A. The Closing-Hours Restriction Applies To Adult Cabarets.
Anchorage Municipal Code 10.40.015 lists four "[p]rohibited acts by holders of adult-oriented establishment license[s] or massage practitioner license[s]"; license-holders may not:
A. Operate the business or engage in the licensed activity between the hours of 2:00 a.m. and 6:00 a.m.
B. Lock patrons inside any part of the premises during business hours.
C. Solicit for another person, engage in or offer to engage in an act of prostitution, cunnilingus, or fellatio with a business invitee.
D. Intentionally expose their genitals to a business invitee or intentionally touch the genitals of a business invitee.[8 ]
Section 10.40.050(A) lists adult-oriented establishments, including adult cabarets, which then are defined as follows: "Adult cabaret means a cabaret which features topless dancers, strippers, male or female impersonators, or similar entertainers. An adult cabaret does not include an establishment licensed for sale of alcoholic beverages."
Based on this plain language, the closing-hours restriction applies to adult cabarets. SinRock "acknowledges that the plain language of [these sections] standing alone is clear." But SinRock argues that the legislative history demonstrates that the Anchorage Municipal Assembly did not intend for the closing-hours restriction to apply to adult cabarets because it was enacted originally to address problems attributable to massage parlors.
Anchorage Municipal Code 10.40.015 was enacted in 1977 and amended in 1978.[9] The original ordinance contained the same restrictions as the current version, but applied only to physical culture studios and massage parlors.[10] The enacting Assembly was concerned primarily about prostitution, noise, *1035 and traffic congestion from these businesses.[11] There was evidence that "massage parlors were generally found in more residential areas and presented distinct problems through flashing neon signs, increased noise and traffic" and that "substantial prostitution activities occurred during the period of 2 a.m. to 6 a.m."[12]
The Assembly revisited the ordinance in 1994, creating a broad licensing and regulatory scheme for adult-oriented establishments and, relevant to this case, enacting AMC 10.40.050 and amending AMC 10.40.015. This version of AMC 10.40.050 defined "adult-oriented establishment" to include adult bookstores, adult motion picture theaters, adult mini-motion picture establishments, physical culture studios, massage parlors, and escort services. But the ordinance expressly exempted adult cabarets from the "adult-oriented establishment" definition. Although the ordinance did not explain why adult cabarets were exempted, an assembly member noted that the exclusion "mean[t] that businesses conducting topless dancing or similar shows [could] not be regulated by th[e] ordinance unless the enterprise also falls into one of the other classifications."
The ordinance amending AMC 10.40.050 included a "whereas" clause, providing:
[A]dult businesses have been determined, by court accepted independent studies, to produce secondary impacts on surrounding land uses. The impacts include a decline in property values, and increase in the level of criminal activity including prostitution, rape, and assaults in the vicinity of these types of enterprises, and the degradation of the community standard of morality by including a loss of sensitivity to the adverse effect of pornography upon children, upon established family relations, and upon respect for marital relationships.[13 ]
This amendment brought most adult entertainment businesses-but not adult cabarets-within AMC 10.40.015's scope.
In 2003 an assembly member proposed amending AMC 10.40.050 to include adult cabarets in the list of businesses required to be licensed, "in furtherance of the protection of the public's health, safety, and welfare." The proposal reiterated that "secondary impacts" associated with adult-oriented establishments "affect[ ] the quality of life in neighborhoods" by "increas[ing] crime rates, declining property values," and by causing "disinvestment and decline in economic and pedestrian activity."
The Assembly held a public hearing on the proposal. A community member testified that research showed a direct correlation between sexually oriented businesses and sexual assaults, prostitution, lower property values, and lower morality; that community member expressed concern over the absence of closing times at these businesses. Another community member testified that girls were being exploited at adult cabarets where there were unhealthy working conditions and underage employment. Others, mostly associated with a local adult cabaret, contested these reports; the minutes reflect their testimonies that young female employees were able to grow into "competent" women "able to support themselves and their families without assistance from government or welfare." Professional dancers also testified to their independence as a result of working at adult cabarets.
Some testimony evidenced a misunderstanding about AMC 10.40.050's previous exemption of adult cabarets from the definition of adult-oriented businesses and the potential impact of including them. One person testified that she had been on the Assembly when the original ordinance was passed and did not know how it had excluded adult cabarets. She believed adult cabarets should conform to the same regulations as other adult-oriented establishments. The minutes indicate that the amendment's sponsor summarized the ordinance as "simply correcting an error in the original law, since cabarets had been overlooked when licensing for adult-oriented *1036 businesses had originally been addressed." And despite AMC 10.40.015(D) prohibiting intentional genital exposure at adult-oriented businesses, the minutes reflect one assembly member's statement that the proposed "ordinance did not prohibit nudity or sexual activity." The minutes show another assembly member advocating postponing the vote because "many questions had been raised about how this ordinance fit into the larger scheme of Municipal regulations"; he also "voiced his concern over possible unfair labor acts within these clubs." The Assembly passed the ordinance, and the amended law became effective in January 2004.
SinRock argues that "the 2003 ordinance that added adult cabarets to the municipal licensing scheme explicitly addressed only AMC 10.40.050." SinRock contends that the Assembly, therefore, did not realize that defining and licensing adult cabarets as adult-oriented businesses under AMC 10.40.050 would subject adult cabarets to AMC 10.40.015's prohibitions. SinRock relies on assembly member comments indicating unawareness that adding adult cabarets would subject them to these prohibitions, including the testimony that the "ordinance did not prohibit nudity or sexual activity" and that there remained many questions about how the amended ordinance would fit into the larger regulatory structure.
Although this legislative history indicates that the 2003 Assembly may have misunderstood the original intentional exclusion of adult cabarets from licensing and been unaware of all the ordinance's consequences, SinRock's argument that the 2003 Assembly did not intend to subject adult cabarets to the closing-hours restriction is unpersuasive. Whether the Assembly considered the ramifications of applying the ordinance to adult cabarets is irrelevant; the minutes reflect the 2003 ordinance's sponsor's indication that the ordinance "was simply correcting an error in the original law." The 2003 Assembly thus clearly intended to subject adult cabarets to the same regulations as other adult-oriented businesses.
SinRock additionally argues that AMC 10.40.015(D), prohibiting intentional genital exposure, is unconstitutional as applied to adult cabarets and, therefore, that the Assembly could not have intended for subsection (A) to apply to adult cabarets. Even assuming subsection (D)'s unconstitutionality, there is no indication the Assembly intended that AMC 10.40.015(A)'s closing-hours restriction not apply. We therefore decline to consider in this case whether subsection (D)'s potential unconstitutionality, as a proxy for legislative intent, renders subsection (A) inapplicable to adult cabarets.
In conclusion, we hold that AMC 10.40.015(A)'s and AMC 10.40.050's plain language makes the closing-hours restriction applicable to adult cabarets; no legislative history evidences a contrary intent compelling a different result. We therefore affirm the superior court's decision upholding the Municipal Clerk's conclusion that-as a matter of statutory interpretation-adult cabarets are prohibited from operating between 2:00 a.m. and 6:00 a.m. under the adult-oriented establishment regulations.
B. Applying This Particular Closing-Hours Restriction To Adult Cabarets Is An Impermissible Government Suppression Of Free Speech Under The Alaska Constitution.
SinRock challenges as unconstitutional, under the federal and Alaska constitutional free speech provisions, the closing-hours restriction as applied to adult cabarets. SinRock argues we should conclude that the closing-hours ordinance is a content-based restriction burdening the right to free speech, subject the ordinance to strict scrutiny, and hold that it cannot stand. SinRock accurately notes that, on questions arising under Alaska's Constitution, we are not bound by decisions of the United States Supreme Court on similar federal provisions but may determine that Alaska provides greater protection for individual rights.[14] Because *1037 we hold that Alaska's free speech clause is more protective of individual rights than its federal counterpart in the present context, we focus our analysis on the Alaska Constitution.[15]
1. As a content-based restriction on free speech, the closing-hours ordinance is subject to strict scrutiny.
In arguing that we should apply strict scrutiny to the ordinance as a matter of Alaska constitutional law, SinRock notes the fractured federal precedent in this area. Although the United States Supreme Court long has construed expressive dancing as falling under the First Amendment's purview, a plurality of the court has held that nude dancing "falls only within the outer ambit of the First Amendment's protection."[16] Subjecting sexual speech to a lesser degree of free speech protection, the Supreme Court has reviewed otherwise content-based restrictions as content-neutral under intermediate scrutiny when the primary motivation behind their enactment is to prevent negative secondary effects.[17]
We previously have not designated sexually oriented speech as less worthy of protection than other types of speech, and we decline to do so now. Article I, section 5 of Alaska's Constitution provides that "[e]very person may freely speak ... being responsible for the abuse of that right." We held in Mickens v. City of Kodiak that this clause protects nude dancing and that "[l]aws prohibiting free expression, based on the content of the expression, are sustainable only for the most compelling of reasons."[18] And we stated that "it is not permissible to suppress constitutionally protected forms of expression ... to curb the lawless conduct of some of those who are reacting to it, unless other law enforcement techniques which do not infringe first amendment freedoms are unavailable or likely to be ineffective."[19]
We long have held that Alaska's constitutional heritage may require individual protections over and above federal guarantees:
[W]e are free, and we are under a duty, to develop additional constitutional rights and privileges under our Alaska Constitution if we find such fundamental rights and privileges to be within the intention and spirit of our local constitutional language and to be necessary for the kind of civilized life and ordered liberty which is at the core of our constitutional heritage.[20 ]
These additional state constitutional guarantees have compelled us to balance an individual's right to liberty against "society's right to impose some limitation on the individual liberty" under a strict scrutiny standard,[21] holding:
Once a fundamental right under the constitution of Alaska has been shown to be involved and it has been further shown that this constitutionally protected right *1038 has been impaired by governmental action, then the government must come forward and meet its substantial burden of establishing that the abridgement in question was justified by a compelling governmental interest.[22 ]
And we have held that the "adoption of the compelling interest standard best comports with the kind of ordered liberty which represents the core of Alaska's constitutional heritage."[23]
Based on the strong constitutional protections afforded Alaska citizens, we confirm that laws regulating the sexual content of messages, and thereby restricting one's right to liberty, are content-based and that we will apply strict scrutiny to determine their constitutionality.[24] Applying the closing-hours restriction to adult cabarets is content-based; determining whether the restriction applies to a particular business requires considering whether it is an "adult-oriented establishment,"[25] and then a business is "burdened only if its expressive products have adult content."[26] We therefore apply strict scrutiny, and we will uphold the ordinance only if it is "narrowly tailored to promote a compelling governmental interest" and if it is "the least restrictive means available to vindicate that interest."[27]
2. The closing-hours restriction as applied to adult cabarets is not sufficiently narrowly tailored to achieve its ends.
The parties do not dispute that in general the Municipality's interests in regulating the "negative effects of cabarets on the community"-including potential "increased crime rates, declining property values, disinvestment[,] ... decline in economic and pedestrian activity,"[28] and "the harmful effects of cabarets on young girls in the community"-are compelling. But the critical issue is whether the Municipality has met its burden of evidence demonstrating that the closing-hours restriction as applied to adult cabarets is narrowly drawn to achieve those interests. We conclude that the Municipality has not met this burden and that the closing-hours restriction, therefore, is constitutionally invalid.
The Municipality argues that it has "specific evidence to support a compelling reason" to uphold AMC 10.40.015(A). The Municipality contends that the public hearing minutes evidence testimony about adult cabarets' negative effects. Even assuming the limited testimony was sufficient to demonstrate *1039 secondary effects from adult cabarets, the Municipality fails to offer specific evidence that forcing adult cabarets to close in the early morning was designed to help reduce these negative effects. The restriction's pre-enactment record consists entirely of private individuals' and assembly members' testimonies discussing in a general conclusory sense perceived negative effects of adult cabarets on surrounding communities. The minutes reflect that one person mentioned closing hours but only as having "concerns" that none existed. There was no evidence, direct or indirect, connecting forced early morning closures with reducing these secondary effects.
As we stated in Mickens v. City of Kodiak , suppressing constitutional speech is impermissible "to curb the lawless conduct of some of those who are reacting to it, unless other law enforcement techniques which do not infringe first amendment freedoms are unavailable or likely to be ineffective."[29] The Municipality has not shown that it could not effectively reduce secondary effects without infringing on otherwise constitutional speech, and we therefore find no basis for concluding that the current closing-hours restriction is constitutional.
Despite the Municipality not meeting its burden of demonstrating narrow tailoring in this case, we do not foreclose the possibility that a similar ordinance may be constitutional. We recognize that the government has compelling interests in combating potential harmful secondary effects. But we require, in all cases, an evidence-based analysis demonstrating how a restriction is narrowly tailored to meet specific, compelling government interests. This may be satisfied, for example, by relying on solid evidence of other communities' experiences or by specific studies presented to the legislature prior to enactment; the government need not wait for harm to arise before enacting legislation aimed at combating potential harmful secondary effects. And the government must demonstrate both that there is evidence of potential harm and that non-infringing law enforcement techniques "are unavailable or likely to be ineffective."[30]
A connection between negative secondary effects and the lack of closing hours for adult cabarets may exist, but the Municipality has failed to meet its burden of demonstrating that connection. We therefore reverse the superior court's decision on this issue.
V. CONCLUSION
We REVERSE the superior court's decision denying SinRock's appeal and hold that, under article I, section 5 of Alaska's Constitution, AMC 10.40.015(A)'s closing-hours restriction is unconstitutional as applied to adult cabarets.

See AMC 10.40.050 (listing "[a]dult-oriented establishment" businesses, including adult cabarets, and defining "[a]dult cabaret" as "a cabaret which features topless dancers, strippers, male or female impersonators, or similar entertainers" and which is not "licensed for sale of alcoholic beverages,"); AMC 10.40.015 (regulating adult-oriented establishments, including adult cabarets).

Studley v. Alaska Pub. Offices Comm'n , 389 P.3d 18, 22 (Alaska 2017) (quoting Tolbert v. Alascom, Inc. , 973 P.2d 603, 606-07 (Alaska 1999), superseded by statute on other grounds as stated in Huit v. Ashwater Burns, Inc. , 372 P.3d 904 (Alaska 2016) ).

Id. (quoting Lakloey, Inc. v. Univ. of Alaska , 141 P.3d 317, 320 (Alaska 2006) ).

Id. at 22-23.

Rosauer v. Manos , 440 P.3d 145, 147 (Alaska 2019) (quoting S. Anchorage Concerned Coal., Inc. v. Municipality of Anchorage Bd. of Adjustment , 172 P.3d 768, 771 (Alaska 2007) ).

Attorneys Liab. Prot. Soc'y, Inc., v. Ingaldson Fitzgerald, P.C. , 370 P.3d 1101, 1105 (Alaska 2016) (quoting Municipality of Anchorage v. Stenseth , 361 P.3d 898, 905 (Alaska 2015) ).

Id. (quoting Stenseth , 361 P.3d at 905 ).

AMC 10.40.015.

Hilbers v. Municipality of Anchorage , 611 P.2d 31, 34 n.1 (Alaska 1980).

Id. at 34.

Id. at 37 ; see also id. at 40 ("The two purposes of AMC 10.40.015 as already noted are the reduction of adverse environmental effects and control of prostitution.").

Id. at 40-41.

AO No. 93-157(S-6) (Feb. 15, 1994).

See Baker v. City of Fairbanks , 471 P.2d 386, 402 n.26 (Alaska 1970) ("We again iterate our position ... that '(w)e are not bound in expounding the Alaska Constitution's Declaration of Rights by the decisions of the United States Supreme Court, past or future, which expound identical or closely similar provisions of the United States Constitution.' ") (alterations in original) (quoting Roberts v. State , 458 P.2d 340, 342 (Alaska 1969) ); see also State, Div. of Elections v. Green Party of Alaska , 118 P.3d 1054, 1060 (Alaska 2005) (explaining "we have often held that Alaska's [C]onstitution is more protective of rights and liberties than is the United States Constitution"); Malabed v. N. Slope Borough , 70 P.3d 416, 420 (Alaska 2003) (stating that "the Alaska Constitution's equal protection clause affords greater protection to individual rights than the United States Constitution's Fourteenth Amendment"); State v. Jones , 706 P.2d 317, 324 (Alaska 1985) (reading Alaska Constitution's prohibition on unreasonable search and seizures more expansively than federal prohibition); State v. Browder , 486 P.2d 925, 935-36 (Alaska 1971) (interpreting right to jury trial in criminal contempt cases more broadly than federal right).

Cf. Mickens v. City of Kodiak , 640 P.2d 818, 820 (Alaska 1982) (holding that Alaska's free speech clause "was meant to be at least as protective of expression as the First Amendment to the United States Constitution").

City of Erie v. Pap's A.M. , 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000).

City of Los Angeles v. Alameda Books, Inc. , 535 U.S. 425, 434, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) ; Erie , 529 U.S. at 293, 120 S.Ct. 1382 ; City of Renton v. Playtime Theatres, Inc. , 475 U.S. 41, 47-48, 50, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).

640 P.2d at 820-21.

Id. at 822.

Baker v. City of Fairbanks , 471 P.2d 386, 402 (Alaska 1970).

Messerli v. State , 626 P.2d 81, 84 (Alaska 1980).

Id. (quoting Breese v. Smith , 501 P.2d 159, 171 (Alaska 1972) ).

Id . (quoting Breese , 501 P.2d at 172 ).

We note the Massachusetts Supreme Court likewise has recognized that the "[f]ederal rule does not adequately protect the rights of the citizens" under its state constitution. Mendoza v. Licensing Bd. of Fall River , 444 Mass. 188, 827 N.E.2d 180, 191 (2005). Other state supreme courts, including Pennsylvania and New York, have reached similar conclusions. Pap's A.M. v. City of Erie , 571 Pa. 375, 812 A.2d 591 (2002) (on remand from United States Supreme Court, court invalidated on state constitutional grounds ordinance proscribing nudity in public places); Bellanca v. N.Y. State Liquor Auth. , 54 N.Y.2d 228, 445 N.Y.S.2d 87, 429 N.E.2d 765 (1981) (on remand from United States Supreme Court, court invalidated on state constitutional grounds complete ban on topless dancing in establishments serving alcohol). At least one federal circuit court also has questioned the secondary-effects doctrine's continued validity. See Free Speech Coal. v. Attorney Gen. U.S. , 825 F.3d 149, 164 (3d Cir. 2016) (stating that "we can no longer look to the purpose of a law that draws a content-based distinction on its face in determining what level of scrutiny to apply").

AMC 10.40.015(A); AMC 10.40.050(A).

City of Los Angeles v. Alameda Books, Inc. , 535 U.S. 425, 457, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (Souter, J., dissenting). See also Gammoh v. City of LaHabra , 395 F.3d 1114, 1123 (9th Cir. 2005) ("[T]he Supreme Court has recognized that virtually all regulation of adult businesses is content-based." (citing Alameda Books , 535 U.S. at 448, 122 S.Ct. 1728 (Kennedy J., concurring))).

See Alaskans for a Common Language, Inc. v. Kritz , 170 P.3d 183, 207-08 (Alaska 2007).

When the licensing structure originally was enacted in 1977, there was evidence that massage parlors and physical culture studios produced negative secondary effects including prostitution, noise, and traffic congestion. Hilbers v. Municipality of Anchorage , 611 P.2d 31, 40-41 (Alaska 1980). We assume, without deciding, that adult cabarets might produce similar negative secondary effects.

640 P.2d 818, 822 (Alaska 1982).

Id.