**LIBERTARIAN PARTY OF ALASKA, INC., Kenneth P. Jacobus, and Kenneth P. Jacobus, P.C., Appellants,**

v.

**STATE of Alaska and Alaska Public Offices Commission, Appellees.**

No. S–11012.

Supreme Court of Alaska.

Nov. 19, 2004.

Kenneth P. Jacobus, P.C., Anchorage, for Appellants.

James L. Baldwin, Assistant Attorney General, Gregg D. Renkes, Attorney General, Juneau, for Appellees.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

The Alaska Campaign Disclosure Act expressly regulates only hard money. The question presented is whether an Alaska Public Offices Commission regulation requiring the disclosure by political parties of soft money contributions and expenditures is authorized by the act. We give an affirmative answer. Soft money can be used in numerous ways to evade hard money restrictions. Requiring the disclosure of soft money contributions and expenditures implements the act by aiding in its enforcement, deterring evasions, and informing the public. We therefore affirm the superior court's decision upholding 2 Alaska Administrative Code (AAC) 50.327.

**BACKGROUND AND PROCEEDINGS**

This case involves a regulation of the Alaska Public Offices Commission (APOC) that requires political parties to report donations and expenditures of "soft money." "Soft money" and "hard money" are exclusive categories. "Hard money" refers to donations made for the purpose of influencing the nomination or election of a candidate.[1] "Soft

1. *Jacobus v. Alaska,* 338 F.3d 1095, 1098 n. 1 (9th Cir.2003).

money" is most easily defined negatively as donations to political parties that are not "hard money," thus not made directly for the purpose of influencing the nomination or election of a candidate.

The Campaign Disclosure Act limits the amount of contributions that may be made to political parties and candidates and limits

2. AS 15.13.070 provides:

(a) An individual or group may make contributions, subject only to the limitations of this chapter and AS 24.45, including the limitations on the maximum amounts set out in this section.

(b) An individual may contribute not more than

(1) $1,000 per year to a nongroup entity for the purpose of influencing the nomination or election of a candidate, to a candidate, to an individual who conducts a write-in campaign as a candidate, or to a group that is not a political party;

(2) $10,000 per year to a political party for the purpose of influencing the nomination or election of a candidate or candidates.

(c) A group that is not a political party may contribute not more than

(1) $2,000 per year to a candidate, or to an individual who conducts a write-in campaign as a candidate;

(2) $2,000 per year to another group or a nongroup entity; or

(3) $4,000 per year to a political party.

(d) A political party may contribute to a candidate, or to an individual who conducts a write-in campaign, for the following offices an amount not to exceed

(1) $100,000 per year, if the election is for governor or lieutenant governor;

(2) $15,000 per year, if the election is for the state senate;

(3) $10,000 per year, if the election is for the state house of representatives; and

(4) $5,000 per year, if the election is for

(A) delegate to a constitutional convention;

(B) judge seeking retention; or

(C) municipal office.

(e) This section does not prohibit a candidate from using up to a total of $1,000 from campaign contributions in a year to pay the cost of

(1) attendance by a candidate or guests of the candidate at an event or other function sponsored by a political party or by a subordinate unit of a political party;

(2) membership in a political party, subordinate unit of a political party, or other entity within a political party, or subscription to a publication from a political party; or

(3) co-sponsorship of an event or other function sponsored by a political party or by a subordinate unit of a political party.

(f) A nongroup entity may contribute not more than $1,000 a year to another nongroup

contributions that political parties may make to candidates.[2] The act also requires that candidates and political parties report individual contributions larger than $100 and all expenditures made.[3] The word "contribution" is defined as a donation of hard money. " 'Contribution' means a ... gift ... made for the purpose of influencing the nomination or election of a candidate...."[4] The word

entity for the purpose of influencing the nomination or election of a candidate, to a candidate, to an individual who conducts a write-in campaign as a candidate, to a group, or to a political party.

3. AS 15.13.040(a) and (b) provide:

(a) Except as provided in (g) and (*l*) of this section, each candidate shall make a full report, upon a form prescribed by the commission,

(1) listing

(A) the date and amount of all expenditures made by the candidate;

(B) the total amount of all contributions, including all funds contributed by the candidate;

(C) the name, address, date, and amount contributed by each contributor; and

(D) for contributions in excess of $250 in the aggregate during a calendar year, the principal occupation and employer of the contributor; and

(2) filed in accordance with AS 15.13.110 and certified correct by the candidate or campaign treasurer.

(b) Except as provided in (*l*) of this section, each group shall make a full report upon a form prescribed by the commission, listing

(1) the name and address of each officer and director;

(2) the aggregate amount of all contributions made to it;

(3) the name, address, date, and amount contributed by each contributor and, for contributions in excess of $250 in the aggregate during a calendar year, the principal occupation and employer of the contributor; and

(4) the date and amount of all contributions made by it and all expenditures made, incurred, or authorized by it.

4. AS 15.13.400(4)(A). "contribution"

means a purchase, payment, promise or obligation to pay, loan or loan guarantee, deposit or gift of money, goods, or services for which charge is ordinarily made and that is made for the purpose of influencing the nomination or election of a candidate, and in AS 15.13.010(b) for the purpose of influencing a ballot proposition or question, including the payment by a person other than a candidate or political party, or compensation for the personal services

"expenditure" is defined in broader terms, in part, as "a transfer of money ... made for the purpose of influencing the nomination or election of a candidate ... [or] use by a political party...."[5]

Prior to the 2002 legislative amendment that we describe below, APOC had considered that all donations to political parties were for the purpose of influencing the election of candidates and thus were hard money.[6] Under this interpretation all donations to political parties were subject to the $5,000 annual limit of subsection .070(b)(2) and all donations in excess of $100 had to be reported under subsection .040(b)(2).

In *Jacobus v. Alaska,* the United States District Court for the District of Alaska ruled that donations to political parties for purposes other than the nomination or election of a candidate could not constitutionally be limited.[7] This holding necessarily rejected APOC's view that all donations to political parties are ultimately for the purpose of influencing the election of a candidate.

In 2002, while the district court decision in *Jacobus* was on appeal to the Ninth Circuit, the legislature amended subsection .070(b)(2).[8] Before the amendment the stat-

ute provided that "An individual may contribute not more than ... $5,000 per year to a political party." The amendment added the following language: "for the purpose of influencing the nomination or election of a candidate or candidates."[9] Literally, the new language seems merely redundant since any donation to a political party would not be a contribution under subsection .400(4)(A) unless it were for the purpose of influencing the nomination or election of a candidate.[10] But the use of the "for the purpose" clause specifically in the context of political party donations may imply that donations to political parties for other purposes are possible. The State observes in its brief that the amendment reflects an intent "to codify part of the federal district court's decision in *Jacobus.*" The appellants do not take issue with this. We can accept, at least for the purposes of this case, that the amendment is the product of a legislative purpose to reject APOC's view that all donations to political parties are intended to influence elections. Some donations to political parties may be, in other words, soft money.[11]

Subsequent to the adoption of the 2002 amendments, APOC received a petition urging the adoption of a regulation governing

---

of another person, that are rendered to the candidate or political party[.]

**5.** AS 15.13.400(6)(A). "expenditure"

means a purchase or a transfer of money or anything of value, or promise or agreement to purchase or transfer money or anything of value, incurred or made for the purpose of
(i) influencing the nomination or election of a candidate or of any individual who files for nomination at a later date and becomes a candidate;
(ii) use by a political party;
(iii) the payment by a person other than a candidate or political party of compensation for the personal services of another person that are rendered to a candidate or political party; or
(iv) influencing the outcome of a ballot proposition or question[.]

**6.** *See* Greg Granquist, APOC Advisory Opinion AO97–08–CD (issued Feb. 27, 1997).

**7.** 182 F.Supp.2d 881, 892 (D.Alaska 2001), *rev'd in part,* 338 F.3d 1095 (9th Cir.2003).

**8.** Ch. 3, § 2, SLA 2002.

**9.** AS 15.13.070(b)(2) now provides:

An individual may contribute not more than

. . .

(2) $10,000 per year to a political party *for the purpose of influencing the nomination or election of a candidate or candidates.*

**10.** Substituting the definition of "contribution" for "contribute" in the amended subsection, the amended sentence states that "an individual may [donate for the purpose of influencing the nomination or election of a candidate] not more than $5,000 per year to a political party for the purpose of influencing the nomination or election of a candidate or candidates."

**11.** After the 2002 amendment was adopted the Ninth Circuit reversed much of the district court's ruling in *Jacobus,* 338 F.3d 1095. Aided by an intervening United States Supreme Court decision, *Federal Election Commission v. Colorado Republican Federal Campaign Committee,* 533 U.S. 431, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001), the court held that the $5,000 limit on contributions to political parties in subsection .070(b), before it was amended, could constitutionally be applied to soft as well as hard money donations. No legislative change was made in reaction to this decision.

the reporting of soft money received and expended by political parties. According to the petition, "at least hundreds of thousands, and perhaps millions, of dollars of 'soft money' " had been donated to Alaska's major political parties since the district court decision. The petitioners argued that

> [g]iven the lack of reporting to APOC, it is not possible for the public to determine if the "soft money" has been given to political parties and/or spent in compliance with Alaska law.... This thwarts a fundamental goal of AS 15.13, which is to require full public disclosure of campaign contributions and expenditures prior to elections so that the voting public can make an informed choice between candidates.
>
> . . . .
>
> .... Without immediate disclosure of this information, the voting public in the primary will not have complete information on which to base an informed choice of which party's ballot to choose (in the upcoming closed primary), or which candidates to vote for.

In November 2002 the commission voted to adopt 2 AAC 50.327. The regulation requires political parties to report all money received or spent that does not qualify as a "contribution" or "expenditure" as those terms are defined in AS 15.13.400.[12]

The Libertarian Party and Kenneth Jacobus (the Party) filed suit in the superior court, challenging the legality of 2 AAC 50.327. The Party then filed a motion for a preliminary injunction on the basis that the APOC lacked the authority to promulgate the regulation. Superior Court Judge Mark Rindner ruled that 2 AAC 50.327 was legally promulgated, and denied the Party's motion for injunctive relief. Subsequently a final judgment declaring that APOC had authority

to promulgate the regulation was entered under Alaska Civil Rule 54(b). The Party appeals.

### The Decision of the Superior Court

The superior court concluded that APOC had the authority to promulgate the regulation. We set out a portion of the superior court's opinion:

> Administrative regulations are presumptively valid and the challenger bears the burden of proving such regulations to be invalid. *O'Callaghan v. Rue*, 996 P.2d 88, 95 (Alaska 2000). Under Alaska's Administrative Procedures Act, either expressed or implied statutory authority is sufficient to support an agenc[y's] adoption of a regulation. *Kelly v. Zamarello*, 486 P.2d 906, 911 (Alaska 1971).
>
> As previously noted certain provisions of the underlying Act were declared unconstitutional by the United States District Court for the District of Alaska in *Jacobus v. State*, 182 F.Supp.2d 881 (D.Alaska 2001). Prior to that other provisions of the Act were also reviewed by the Alaska Supreme Court. *See State v. Alaska Civil Liberties Union*, 978 P.2d 597 (Alaska 1999). There, the Alaska Supreme Court noted that "it is the purpose of this Act to substantially revise Alaska's election campaign finance laws in order to restore the public's trust in the electoral process and to foster good government." *Id.* at 601; *see also* Ch. 48 § 1, SLA 1996.
>
> The Plaintiffs concede that the authority of an administrative agency ordinarily includes the power to adopt regulations with regard to matters within the jurisdiction of the agency, provided that the regulations are not inconsistent with law. A regula-

12. 2 AAC 50.327 provides:
   (a) This section applies to political party reporting requirements for a donation received by a political party that does not qualify as a contribution under AS 15.13.400 and for money spent by a political party that does not qualify as an expenditure under AS 15.13.400.
   (b) A political party shall file a full report, in accordance with the contribution reporting requirements for a group in AS 15.13.040 and 15.13.110, of a donation consisting of a purchase, payment, promise or obligation to pay,

loan or loan guarantee, deposit or gift of money, goods or services, other than volunteer services provided by an individual, that the political party receives from an individual or person and that does not qualify as a contribution.
   (c) A political party shall file a full report, in accordance with the expenditure reporting requirements for a group in AS 15.13.040 and 15.13.110, of all money spent by a political party on a communication and all money spent that does not qualify as an expenditure.

tion is consistent with law if it bears a reasonable relationship to the statutory objective. *Vail v. Coffman Engineers, Inc.,* 778 P.2d 211, 214 (Alaska 1989); *see also, Kalmakoff v. State, Commercial Fisheries Entry Commission,* 693 P.2d 844, 853 (Alaska 1985).

The Alaska Supreme Court has also recognized that an agency may adopt a regulation based on implied statutory authority, where the Legislature has given an agency authority to promulgate regulations, and the regulation is reasonably necessary to carry out the provisions of the agenc[y's] enabling charter. *See Chevron U.S.A., Inc. v. LeResche,* 663 P.2d 923 (Alaska 1983); *Boehl v. Sabre Jet Room, Inc.,* 349 P.2d 585, 587–88 (Alaska 1960).

While the parties vigorously dispute whether the APOC has the express authority to promulgate the regulation, there can be little doubt that the agency has the implied authority to require the disclosure of soft money contributions in light of the purpose of the Act. Indeed, the Alaska Supreme Court has previously noted that disclosure requirements, such as the one at issue in this case, serve various purposes including providing for an informed electorate, deterring corruption, and assisting in the detection of violations of contribution limitations. *See VECO International, Inc. v. APOC,* 753 P.2d 703, 711 (Alaska 1988). In *VECO,* the Alaska Supreme Court reiterated its own observation in *Messerli v. State,* 626 P.2d 81, 85 (Alaska 1981), and that of the United States Supreme Court in *Buckley v. Valeo,* 424 U.S. 1, 67–68, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), as follows:

> [D]isclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. This exposure may discourage those who would use money for improper purposes either before or after the election. A public armed with information about a candidate's most generous supporters is better able to detect any post election special favors that may be given in return.

> . . .

> [N]ot least significant, record keeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contributions limitations. . . .

*VECO, supra* 753 P.2d at 712.

A similar observation was made in *United States v. Kanchanalak,* 192 F.3d 1037 (D.C.Cir.1999). There, the D.C. Circuit in *dicta* noted that the Federal Election Commission, the federal equivalent of the APOC, has for some time required by regulation the disclosure of soft money contributions received by political parties at the federal level under 11 C.F.R. § 104.8(e). This ability to require soft money disclosure enhances the agency's ability to prohibit the illegal commingling of hard and soft money receipts. While plaintiffs argue that the APOC has less authority to promulgate regulations than does the Federal Election Commission, the regulation at issue in this case similarly allows the APOC to enforce hard money limits and other provisions of the Campaign Finance Law.

Given the stated purpose of the Act there can be little doubt that the soft money disclosure requirement falls within, at the very least, the implied authority of the APOC. As previously indicated such disclosures inform the electorate, aid in the deterrence of corruption, and the detection of violations of contribution limitations. Such requirements serve the expressed legislative purpose of the Campaign Finance Statutes from which the APOC derives its authority to restore the public's trust in the electoral process and to foster good government.

**Contentions on Appeal**

The Party contends that the regulation exceeds the authority of the commission because the act only regulates hard money donations and expenditures. Alaska Statute 15.13.010(b) provides:

> Except as otherwise provided, this chapter applies to contributions, expenditures and communications made by a candidate, group, nongroup entity, municipality or in-

dividual for the purpose of influencing the outcome of a ballot proposition or question as well as those made to influence the nomination or election of a candidate.

The Party argues that since the act does not apply to soft money, APOC cannot require the disclosure of soft money donations or expenditures.

The State contends that the regulation is within both the express and the implied authority of the commission. The State notes that APOC has the express authority to develop and provide forms for reports required under the act, to audit such reports, and to adopt regulations necessary to implement and clarify the provisions of the act.[13] Based on this authority, the State contends that "the soft money disclosure regulation is necessary to allow APOC to make sure that soft money is not spent on election activities; without such a regulation it will be unable to do so."

## STANDARD OF REVIEW

■ In this case we are asked to decide whether a regulation is within the authority of the agency that promulgated it. The principles applicable to appellate review of such questions are as follows:

> Regulations are presumptively valid and will be upheld as long as they are "consistent with and reasonably necessary to implement the statutes authorizing their adoption." But reasonable necessity is not a requirement separate from consistency. If it were, courts would be required to judge whether a particular administrative regulation is desirable as a matter of policy. Thus where a regulation is adopted in accordance with the Administrative Procedures Act, and the legislature intended to give the agency discretion, we review the

13. AS 15.13.030(1), (7), and (9).

14. *Interior Alaska Airboat Ass'n v. State, Bd. of Game*, 18 P.3d 686, 689–90 (Alaska 2001) (citations omitted).

15. *State v. Alaska Civil Liberties Union*, 978 P.2d 597, 605 (Alaska 1999) (quoting *Buckley v. Valeo*, 424 U.S. 1, 25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)):

> To the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the integrity of

regulation first by ascertaining whether the regulation is consistent with the statutory provisions which authorize it and second by determining whether the regulation is reasonable and not arbitrary.

In determining whether a regulation is reasonable and not arbitrary courts are not to substitute their judgment for the judgment of the agency. Therefore review consists primarily of ensuring that the agency has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making.[14]

## DISCUSSION

■ We conclude that 2 AAC 50.327 is consistent with the Campaign Disclosure Act and that its provisions are reasonable and not arbitrary. We do so largely for the reasons expressed by Judge Rindner, as expanded in the paragraphs that follow.

■ The purposes of campaign contribution and expenditure limits are to prevent "corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office."[15] The purposes of campaign finance disclosure requirements are closely related. Disclosure is intended to inform the electorate, deter actual corruption and avoid the appearance of corruption, and aid in the detection of violations of contribution and expenditure limits. In *Messerli v. State* we quoted with approval the following language from *Buckley v. Valeo* concerning the function of campaign finance disclosure requirements:

> our system of representative democracy is undermined. . . .
> Of almost equal concern as the danger of actual *quid pro quo* arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions. . . . Here . . . Congress could legitimately conclude that the avoidance of the appearance of improper influence "is also critical . . . if confidence in the system of representative Government is not to be eroded to a disastrous extent."

*First, disclosure provides the electorate with information "as to where political campaign money comes from and how it is spent by the candidate" in order to aid the voters in evaluating those who seek federal office.* It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office.

*Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity.* This exposure may discourage those who would use money for improper purposes either before or after the election. A public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return. And, as we recognized in *Burroughs v. United States*, [290 U.S. 534, 548, 54 S.Ct. 287, 78 L.Ed. 484 (1934),] Congress could reasonably conclude that full disclosure during an election campaign tends "to prevent the corrupt use of money to affect elections." In enacting these requirements it may have been mindful of Mr. Justice Brandeis' advice:

> Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.

*Third, and not least significant, record-keeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations....* [16]

We conclude that all three of these reasons are served by the regulation in question. Soft money disclosure implements the act because it informs the electorate as to the sources of political party money. It aids in the deterrence of corruption by exposing large contributions and expenditures to the light of publicity. And it provides information that aids the commission in enforcing the hard money contribution and expenditure limits that the act imposes.

The nexus between soft money and the recognized purposes of the act was recognized by the Ninth Circuit in *Jacobus v. Alaska.*[17] The Ninth Circuit stated:

> [S]oft money presents a danger of corruption and the appearance of corruption because political parties trade influence and access to candidates for soft money dollars, and candidates trade influence and access for the indirect benefits that they receive from soft money contributions to their party. In addition, candidates' heavy involvement in soft money fundraising and the creation of "tallying" and other methods for tracking soft money contributions secured by particular candidates indicate that soft money is indeed used to circumvent hard money contribution limits.[18]

Concerning the goals of preventing corruption and the appearance of corruption, the court expanded on these observations as follows:

> In light of modern campaign practices, it is not necessary that money funneled through political parties be specifically designated for the election or nomination of a candidate to have a corrupting influence. *Colorado Republican II* offers a compelling account of the danger of corruption inherent in unlimited soft money contributions to parties, one that accounts for "how the power of money actually works in the political structure." 533 U.S. at 450, 121 S.Ct. 2351. Parties centralize fundraising for a broad set of candidates and programs, and therefore act as magnets for special interest groups who are looking for the most efficient ways to "ad-

---

**16.** 626 P.2d 81, 84–85 (Alaska 1980) (quoting *Buckley*, 424 U.S. at 66–68, 96 S.Ct. 612) (emphasis added) (citations omitted). We also acknowledged these purposes in *VECO Int'l, Inc. v. Alaska Pub. Offices Comm'n*, 753 P.2d 703, 711–12 (Alaska 1988).

**17.** 338 F.3d 1095 (9th Cir.2003).

**18.** *Id.* at 1099.

vanc[e] their narrow interests." *Id.* at 451, 121 S.Ct. 2351 (alteration marks omitted).

[M]any PACs ... contribut[e] to both parties during the same electoral cycle, and sometimes even directly to two competing candidates in the same election. Parties are thus necessarily the instruments of some contributors whose object is not to support the party's message or to elect party candidates across the board, but rather to support a specific candidate for the sake of a position on one narrow issue, or even to support any candidate who will be obliged to the contributors.

*Id.* at 451–52, 121 S.Ct. 2351 (footnotes and citation omitted). Such practices lead to two types of inappropriate influence by large soft money contributors.

First, such contributions create the danger that the parties themselves will become beholden to special interests. As the Supreme Court noted in *Colorado Republican II,* these obligations are of concern because of the parties' unique ability to reward major benefactors with access to lawmakers and candidates: "the record shows that even under present law substantial donations turn the parties into matchmakers whose special meetings and receptions give the donors the chance to get their points across to the candidates." 533 U.S. at 461, 121 S.Ct. 2351; *see also id.* at 461 n. 25, 121 S.Ct. 2351; *Mariani v. United States,* 212 F.3d 761, 768 (3d Cir. 2000) (en banc) ("Large and repeat donors sometime [sic] get more access than other donors, and donating soft money can be a more effective means for getting access than hard money."). Like direct influence-peddling by candidates, this kind of access-peddling creates a danger of corruption and the appearance of corruption.

Second, candidates and officeholders who are party members may become directly beholden to the party's donors, even if the benefit that they receive from a large donation to the party is indirect. Contributing to parties is an extremely efficient way for a special interest group "to produce obligated officeholders," because it allows such a group to obligate anyone and

everyone in a political party, rather than limiting its influence to specific candidates. *Colorado Republican II,* 533 U.S. at 452, 121 S.Ct. 2351. Candidates and officeholders are likely to feel obligated to major party donors because they are already beholden to the party as a result of the benefits that flow from party membership. *See Colorado Republican Federal Campaign Committee v. Federal Election Committee (Colorado Republican I),* 518 U.S. 604, 648, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (Stevens, J., dissenting) ("A party shares a unique relationship with the candidate it sponsors because their political fates are inextricably linked. That interdependency creates a special danger that the party—or the persons that control the party—will abuse the influence it has over the candidate by virtue of its power to spend."). The Court in *Colorado Republican II* even noted that influence within the party itself was a significant benefit for which candidates and officeholders might be willing to trade influence over the legislative process. *See* 533 U.S. at 460 n. 23, 121 S.Ct. 2351.

As *Colorado Republican II* recognized, special interests contribute to candidates competing against each other in the same election "because they want favors" from whomever is elected. 533 U.S. at 451 n. 12, 121 S.Ct. 2351; *see also id.* at 451–52 & nn. 13, 14, 121 S.Ct. 2351. Because a modern election campaign simply cannot be conducted without significant sums of money, candidates become beholden to the sources of any contributions that aid their campaign, whether given directly or indirectly. *See Buckley,* 424 U.S. at 26, 96 S.Ct. 612 ("The increasing importance of the communications media and sophisticated mass-mailing and polling operations to effective campaigning make the raising of large sums of money an ever more essential ingredient of an effective candidacy."). The Alaska Legislature focused on this issue in passing the Act, finding that "organized special interests are responsible for raising a significant portion of all election campaign funds and may thereby gain an undue influence over election campaigns

·and elected officials." 1996 Alaska Sess. Laws 48 § 1(a)(3).

Amicus curiae Republican National Committee notes that some political parties have functions other than simply electing candidates to office. Although this position is contrary to that taken by its state affiliates in previous litigation, *see, e.g., Colorado Republican I & II*, it may well be accurate. However, *even where* contributions to a political party are expressly earmarked for the purpose of administrative costs or off-year issue advocacy, and *even if* political parties do not use donations for these purposes to shift funds into election campaigns, the *perception of corruption* decried by the Supreme Court may still persist when contributors provide large sums of money to political parties, regardless of the purpose and ultimate use of the funds. As noted above, this perception of corruption was a matter of particular concern to Alaska legislators in enacting the Act.1996 Alaska Sess. Laws 48 § 1(b).[19]

As to the objective of preventing circumvention of hard money limits, the Ninth Circuit stated:

In *Colorado Republican II*, the Supreme Court recognized a closely-related additional governmental interest that might justify contribution limits—the interest in preventing "circumvention of contribution limits designed to combat the corrupting influence of large contributions to candidates." 533 U.S. at 456 n. 18, 121 S.Ct. 2351; *see also id.* at 456, 121 S.Ct. 2351; [*Federal Election Commission v.*] *Beaumont*, 539 U.S. [146] at 155, 123 S.Ct. [2200] at 2207 [156 L.Ed.2d 179 (2003)] ("[R]ecent cases have recognized that restricting contributions by various organizations hedges against their use as conduits for 'circumvention of [valid] contribution limits.' " (quoting *Colorado Republican II*, 533 U.S. at 456 & n. 18, 121 S.Ct. 2351) (second alteration in original)); *Cal. Med. Ass'n* [*v. Federal Election Commission*], 453 U.S. [182] at 197–99, 101 S.Ct. 2712 [69 L.Ed.2d 567 (1981)] (holding that limits on contributions to multicandidate committees

are "an appropriate means by which Congress could seek to protect the integrity of the contribution restrictions upheld by this Court in *Buckley* "); *Buckley*, 424 U.S. at 35–36, 38, 96 S.Ct. 612.

As the Supreme Court found in *Colorado Republican II*, faced with federal limits on direct contributions to candidates, powerful donors have used "contributions to a party ... as a funnel from donors to candidates." 533 U.S. at 461, 121 S.Ct. 2351. This response shows how soft money contributions are used to circumvent contribution limits.

Under [FECA], a donor is limited to $2,000 in contributions to one candidate in a given election cycle. The same donor may give as much as another $20,000 each year to a national party committee supporting the candidate. What a realist would expect to occur has occurred. Donors give to the party with the tacit understanding that the favored candidate will benefit.

*Id.* at 458, 121 S.Ct. 2351. This practice is so common, the Court went on to note, that "[a]lthough the understanding between donor and party may involve no definite commitment and may be tacit on the donor's part," the National Democratic Party has developed a "manner of informal bookkeeping" known as "tallying" to ensure that the amount of money that a candidate receives from the party corresponds to the amount that the candidate raised for the party. *Id.* at 459, 121 S.Ct. 2351. The theory that soft money contributions are a means of circumventing limits on contributions to candidates is bolstered by the extensive role that candidates play in party fundraising.

Many of the "party-building" activities claimed by Jacobus to be unrelated to electing candidates are easily targeted to a particular candidate, such as the promotion of a Get Out the Vote initiative in a candidate's district, or sponsorship of a legislative initiative that a candidate has made part of his or her campaign platform. Thus, these activities provide a low effort,

---

19. *Id.* at 1112–14 (footnotes omitted).

low-risk way to circumvent contribution limits. *See Republican Party v. Pauly*, 63 F.Supp.2d [1008] at 1016 [(D.Minn.1999)] ("The [Republican Party of Minnesota] often provided administrative and strategic support to the candidates. The party coordinated candidate appearances and voter registration drives, and helped to recruit volunteer assistance.").

In sum, "parties ... function for the benefit of donors whose object is to place candidates under obligation." *Colorado Republican II*, 533 U.S. at 455, 121 S.Ct. 2351. Prevention of the corruption and appearance of corruption that result from this inescapable reality is a sufficiently important governmental interest to support limiting soft money contributions.[20]

The relevance of unregulated soft money to regulated hard money has also been recognized by the federal counterpart to APOC, the Federal Election Commission. The FEC requires political committees to report the sources of their soft money donations even though the Federal Election Campaign Act only prohibits transfers of hard money.[21] The Court of Appeals for the District of Columbia Circuit has observed that the FEC requires the disclosure of soft money donations in order "to enhance its ability to prohibit the illegal commingling of hard and soft money receipts ... to assist it in tracking the flow of funds between the two." [22]

In committee hearings that led to the enactment of the 2002 amendment to AS 15.13.070(b)(2) concern was also expressed about the potential enforcement difficulties that might result from exempting soft money from contribution and expenditure limits. These concerns were answered by assurances that APOC's regulatory powers could be used to address the problem. Thus, when the proposed amendment came before the House Rules Committee, Mr. Balash of the staff of the Senate State Affairs Committee testified on behalf of the sponsoring Senate committee. Representative Berkowitz expressed concern about commingling. According to the official minutes:

> REPRESENTATIVE BERKOWITZ said that his biggest concern with the Singleton ruling and version Q is the $5,000 allowance for the purpose of influencing the nomination or election of a candidate. Although he understood the court's ruling, he expressed concern with how large gifts could be cordoned off and how one could account for what works towards influencing the nomination or election of a candidate. For example, the Democratic Party has an executive director who isn't always working on campaigns and thus he inquired as to how one segregates the value of something generic from something that benefits a campaign.[23]

Balash responded that APOC's regulatory powers would supply the answer:

> MR. BALASH surmised that under APOC's regulatory powers, certain instances and forms would be established in order to determine what contributions are for what.[24]

Based on this exchange, it is apparent that in the process of enacting the 2002 amendment the legislature recognized that the commission would be able to provide at least a partial regulatory solution to the problem of commingling soft and hard money.

In sum, as the authorities cited above recognize, soft and hard money contributions·to and expenditures by political parties are closely related. The regulation at issue, requiring that political parties report soft money contributions and expenditures, implements the Campaign Disclosure Act by facilitating the enforcement of hard money limits. It also deters practices that can reasonably be regarded as efforts to evade those limits, and advances the public infor-

**20.** *Id.* at 1114–15 (footnote omitted).

**21.** *See United States v. Kanchanalak*, 192 F.3d 1037, 1042 (D.C.Cir.1999).

**22.** *Id.* at 1046. The Party argues that the federal example is inapposite because the FEC has been delegated broader powers than APOC. But we refer to the federal example to illustrate that there is a logical nexus between the disclosure of soft money contributions and the enforcement of limits on contributions and expenditures of hard money. This nexus is factual and is independent of the differences in delegated authority between the federal and state agencies.

**23.** Committee Minutes, House Rules Committee Hearing on S.B. 103 (April 19, 2001) at 130.

**24.** *Id.*

mational goals of the act. For these reasons, we conclude that the regulation is consistent with the Campaign Disclosure Act.

The Party makes no separate challenge that the regulation is unreasonable and arbitrary. We have noted that in reviewing the reasonableness of a regulation we will not question its wisdom, but rather will consider "whether the agency has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making." [25] This regulation was promulgated following the district court's decision in *Jacobus* and the subsequent petition by a group of citizens concerned that political parties would attempt to bypass contribution and expenditure limits through the use of soft money. The Party does not contend that the regulation was the product of capricious or insufficiently deliberative decision making and thus, under the presumption of administrative regularity,[26] the regulation readily passes this aspect of appellate review.

## CONCLUSION

For these reasons we conclude that the Alaska Public Offices Commission was authorized to promulgate 2 AAC 50.327. The judgment of the superior court is therefore AFFIRMED.

**25.** *O'Callaghan v. Rue*, 996 P.2d 88, 98 (Alaska 2000) (quotations omitted); *Rutter v. State*, 963 P.2d 1007, 1009 (Alaska 1998).

**26.** *O'Callaghan*, 996 P.2d at 95.