*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| REPUBLICAN GOVERNORS ASSOCIATION, | ) ) ) Supreme Court No. S-17768 |
| Appellant, | ) ) Superior Court No. 3AN-18-10129 CI ) |
| v. | ) O P I N I O N ) |
| ALASKA PUBLIC OFFICES COMMISSION and WALKER MALLOTT FOR ALASKA, | ) No. 7522 – April 30, 2021 ) ) ) |
| Appellees. | ) ) ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances: Stacey C. Stone, Holmes Weddle & Barcott, P.C., Anchorage, for Appellant. Laura E. Wolff, Assistant Attorney General, Anchorage, and Clyde "Ed" Sniffen, Jr., Acting Attorney General, Juneau, for Appellee Alaska Public Offices Commission. No appearance by Appellee Walker Mallott for Alaska.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices. [Borghesan, Justice, not participating.]

BOLGER, Chief Justice.

# I.    INTRODUCTION

A national political organization engaged an Alaska media consultant to reserve over $1 million worth of television advertising time prior to the 2018 gubernatorial primary race. The national organization did not register with the Alaska Public Office Commission, which administers the state's campaign finance laws, and did not report the reservations to the agency. The Commission concluded that this conduct violated a statute requiring all entities to register before making any "expenditures," including promises or agreements to transfer something of value, to influence an election.

The superior court affirmed the Commission's decision on appeal. The national organization now appeals to us, arguing that the Commission defined "expenditures" too broadly. But we conclude that the Commission reasonably interpreted the campaign finance statute to include agreements to purchase television advertising, even when these agreements are not legally binding. We therefore affirm the superior court's decision affirming the Commission's order.

# II.    FACTS AND PROCEDURAL HISTORY

## A.    Facts

The Alaska Public Offices Commission is a nonpartisan agency responsible for implementing and enforcing Alaska's campaign finance laws, including those mandating disclosure of contributions and expenditures.[1] An "expenditure" is statutorily defined as "a purchase or a transfer of money or anything of value, or promise or agreement to purchase or transfer money or anything of value, incurred or made for the purpose of . . . influencing the . . . election of a candidate."[2] All entities are required to

---

[1]    *See* AS 15.13.020 (establishing Commission); AS 15.13.030 (setting out duties of Commission); AS 15.13.380 (authorizing enforcement by Commission).

[2]    AS 15.13.400(6)(A).

register with the Commission prior to making such an expenditure, and an expenditure must be reported; if the expenditure changes, the report must be promptly updated.[3] The Commission uses these reports to monitor for potential campaign finance violations and makes the information publicly available to help the electorate make informed voting choices.[4]

The Republican Governors Association (RGA) is a national political organization that seeks to elect and support Republican governors across the United States. In April 2018 RGA announced in a press release that it had reserved $1.5 million worth of television advertising time for Alaska's upcoming gubernatorial election. It explained that "[b]y booking these ad reservations ahead of other campaigns and groups, the RGA will save considerable resources" and "ensur[e] [RGA's] resources will be the most efficient on the field." RGA never registered with the Commission or reported the television advertising reservations.

Many of RGA's media reservations specifically identified the date and shows during which the advertisements were scheduled to run, although others listed only a date range and number of spots reserved. The reservations were documented on forms labeled as "[c]ontract[s]," although RGA did not pay for the reservations and the forms were not signed.

RGA engaged Pinpoint Media, Inc. (Pinpoint), a media consulting agency working with RGA in several states during the 2018 elections, to make these reservations. Pinpoint "assisted RGA with reserving placement of advertising with

---

[3]    *See* AS 15.13.050(a) (requiring "each person other than an individual" to register before making expenditures); AS 15.13.040 (requiring expenditures to be reported); 2 Alaska Administrative Code (AAC) 50.321(g) (2021) (requiring changes to be reported).

[4]    AS 15.13.030(5) and (7).

Alaska television stations" and filed documents with the Federal Communications Commission (FCC) stating that it had reserved media time on RGA's behalf. In keeping with industry practice, RGA did not pay Pinpoint for its work in Alaska, although several reservations note Pinpoint's expected commission. RGA did not report Pinpoint's work to the Commission.

Shortly after Mike Dunleavy won the Alaska Republican gubernatorial primary, RGA transferred its media reservations to Families for Alaska's Future – Dunleavy (FFAF), an Alaska-based group formed to support Dunleavy's campaign. The transfer was done by Pinpoint, which asked stations to "change the advertiser name to [FFAF] on all RGA orders that we booked a few months ago." The next day RGA contributed $400,000 to FFAF, and FFAF paid Pinpoint $380,900 for "[m]edia [p]lacement in [the] Anchorage [m]arket." All four television stations listed in the FFAF payment to Pinpoint were named in the reservations originally made by Pinpoint for RGA.

The day after the transfer, the treasurer of incumbent governor Bill Walker's reelection campaign (Walker-Mallott) noticed a local article reporting that FFAF, backed by RGA, had spent over $1.1 million on advertising in support of Dunleavy. After sifting through FCC files, the treasurer discovered multiple contracts for advertising time in RGA's name. Walker-Mallott then filed an expedited complaint against RGA with the Commission,[5] alleging RGA's early media reservations constituted expenditures and RGA should have registered with the Commission before making them.

---

[5] Walker-Mallot also filed an expedited complaint against FFAF. Because FFAF never reported the transfer of RGA's reservations, the Commission imposed a fine against FFAF; FFAF did not appeal.

## B.     Procedural History

At an initial hearing on October 2, 2018, the Commission concluded there were sufficient grounds to grant expedited review.  RGA and Walker-Mallott appeared at the expedited hearing two days later.  The Commission considered exhibits from both parties.  Walker-Mallot submitted RGA's April press release, RGA's media reservations, documents transferring those reservations to FFAF, excerpts from the Commission's campaign disclosure manual, and a form filed with the FCC on RGA's behalf by Pinpoint.

RGA submitted affidavits from its chief financial officer and a Pinpoint media consultant stating that RGA had not paid for any media reservations.  The Pinpoint consultant added that the reservations she had placed were non-binding and that one media company had cancelled some of its reservations.  RGA also submitted two letters from media companies explaining that media reservations were "not guaranteed until payment is received" and could be cancelled or revised by the advertiser.

Walker-Mallott called a media marketing consultant and a political campaign manager as witnesses.  They testified that television advertising reservations are taken very seriously by media entities, as they remove airtime from the market and are rarely cancelled.  As one said, "[I]f you expect to do business with that station in the future, you have to pay the bill."  The witnesses also explained why media consultants provide a valuable service to advertisers:  they can place reservations at lower prices and more advantageous times, and deny their clients' competitors access to preferred time slots.  They agreed that it is industry practice for consultants to receive a commission when the reservations are paid for, rather than being paid directly by their clients.  And they said that however the consultants are paid, the consultants work for the organizations seeking to place reservations, not for the media companies.

The Commission determined that both reserving television air time and hiring Pinpoint to do so constituted expenditures and that RGA had violated Alaska election law by making these expenditures before registration. The Commission ordered RGA to register and pay a civil penalty of $4,500.[6] RGA appealed to the superior court.

The superior court affirmed the Commission's decision. It concluded that the Commission's definition of "expenditure" was "the most reasonable interpretation" of the term and that substantial evidence supported its determination that both RGA's media reservations and its engagement of Pinpoint constituted expenditures. The court thus affirmed the civil penalty assessed against RGA and awarded the State 20% of its attorney's fees as the prevailing party.

RGA now appeals to us.

## III.    STANDARD OF REVIEW

When the superior court has acted as an intermediate court of appeal, we review the administrative decision directly.[7] We apply the substantial evidence standard to questions of fact, affirming the agency's findings where there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[8]

---

[6]    Citing a violation of AS 15.13.050(a), the Commission calculated RGA's maximum fine as $8,900 under AS 15.13.380(d) (providing for civil penalties) and AS 15.13.390(a) (providing penalty amount). It reduced the penalty because of RGA's status as an "inexperienced filer[ ]."

[7]    *Studley v. Alaska Pub. Offices Comm'n*, 389 P.3d 18, 22 (Alaska 2017).

[8]    *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1231 (Alaska 2003) (quoting *Grove v. Alaska Constr. & Erectors*, 948 P.2d 454, 456 (Alaska 1997)).

We review agency interpretations of statutes under one of two standards.[9] The reasonable basis standard, under which we defer to the agency's interpretation unless it is unreasonable, applies "when the question involves fundamental policy decisions or administrative expertise."[10]  In contrast, we substitute our own judgment "where the agency's specialized knowledge and experience would not be particularly probative on the meaning of the statute."[11]  We need not resolve which standard applies in this case, as the Commission's interpretation is "the most persuasive in light of precedent, reason, and policy"[12] and thus passes under either standard of review.

## IV.    DISCUSSION

### A.    The Commission's Interpretation Of "Expenditure" Is Reasonable.

Under Alaska law, "each person other than an individual" must register with the Commission "[b]efore making an expenditure in support of . . . a candidate."[13] An expenditure includes a "promise or agreement to purchase or transfer money or

---

[9]    *Alaskan Crude Corp. v. State, Dep't of Nat. Res., Div. of Oil & Gas*, 261 P.3d 412, 419 (Alaska 2011).

[10]    *Eberhart v. Alaska Pub. Offices Comm'n*, 426 P.3d 890, 896 (Alaska 2018) (quoting *Alaska Pub. Interest Research Grp. v. State*, 167 P.3d 27, 42 (Alaska 2007)).

[11]    *Marathon Oil Co. v. State, Dep't of Nat. Res*., 254 P.3d 1078, 1082 (Alaska 2011) (quoting *Matanuska-Susitna Borough v. Hammond*, 726 P.2d 166, 175 (Alaska 1986)).

[12]    *Alyeska Pipeline Serv. Co.,* 77 P.3d at 1231 (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)) (applying the independent judgment standard); *see also Eberhart*, 426 P.3d at 896 ("We do not need to resolve which standard applies in this case because [the Commission's] interpretation is the most logical and reasonable interpretation of the statute.").

[13]    AS 15.13.050(a).

anything of value."[14]  Because neither "promise" nor "agreement" is statutorily defined, the Commission argues that the terms should be interpreted according to their common usage and given a broader meaning than "contract."

An agreement is "an expression of greater breadth of meaning and less technicality [than a contract].  Every contract is an agreement; but not every agreement is a contract."[15]  The term can include "any arrangement between two or more persons intended to affect their relations (whether legal or otherwise) to each other."[16]  Similarly, "a promise is an expression leading another person justifiably to expect certain conduct on the part of the promisor."[17]  Only if "by reason of other operative facts the promise is recognized as creating a legal duty" is it a contract.[18]  Therefore, the Commission argues, the statute cannot be limited to valid contracts.

RGA objects that this interpretation is overbroad, arguing that a "promise or agreement" requires all the elements of a valid contract:  "an offer encompassing all essential terms, unequivocal acceptance by the offeree, consideration, and an intent to

---

[14]    AS 15.13.400(6)(A).

[15]    *Agreement*, BLACK'S LAW DICTIONARY (11th ed. 2019) (quoting 2 STEPHEN'S COMMENTARIES ON THE LAWS OF ENGLAND 5 (L. Crispin Warmington ed., 21st ed. 1950)).

[16]    *Id.*

[17]    *Promise*, BLACK'S LAW DICTIONARY (11th ed. 2019) (quoting WILLIAM R. ANSON, PRINCIPLES OF THE LAW OF CONTRACT 6 n.3 (Arthur L. Corbin ed., 3d Am. ed. 1919)).

[18]    *Id.* (quoting SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 1A, at 4 (Walter H.E. Jaeger ed., 3d ed. 1957)).

be bound."[19] Even though the statute does not expressly require a contract, RGA claims no agreement could be enforceable without "a meeting of the minds on material terms." RGA therefore claims that because its reservations were not legally binding contracts, they cannot have been expenditures.

But this appeal does not concern contract enforcement. The question before us is whether RGA's actions constituted expenditures for the purposes of the campaign finance registration statute.[20] And we see no indication that the drafters intended to limit this statute's applicability to contracts.

When interpreting a statute, we "presume that no words or provisions are superfluous and that the legislature intended 'every word, sentence, or provision of a statute to have some purpose, force, and effect.' "[21] The Alaska legislature could have referred specifically to "contracts" if it meant to so limit the scope of the reporting requirements. Instead, it chose the more expansive phrase "promise or agreement."[22] We decline to narrow the statute's plain language without a good reason to do so.

The Commission's interpretation of "expenditure" reflects the purposes of campaign disclosure laws: "providing for an informed electorate, deterring corruption, and assisting in the detection of violations of contribution limitations."[23] We have previously recognized the importance of these purposes in interpreting campaign finance statutes. In *Libertarian Party of Alaska, Inc. v. State* we upheld a regulation requiring

---

[19]     *Davis v. Dykman*, 938 P.2d 1002, 1006 (Alaska 1997).

[20]     AS 15.13.050.

[21]     *Adamson v. Municipality of Anchorage*, 333 P.3d 5, 16 (Alaska 2014) (quoting *Monzulla v. Voorhees Concrete Cutting*, 254 P.3d 341, 345 (Alaska 2011)).

[22]     AS 15.13.400(7)(A).

[23]     *Libertarian Party of Alaska, Inc. v. State*, 101 P.3d 616, 621 (Alaska 2004).

disclosure of "soft money" contributions in addition to the "hard money" contributions expressly regulated under the campaign disclosure statutes.[24] We reasoned that if the Commission could not compel disclosure of soft money, then it could not meaningfully track hard money, making the regulation reasonably necessary to implement the law.[25] Similarly, in *Eberhart v. Alaska Public Offices Commission* we concluded that the Commission had reasonably defined government "money" to include governmental resources and assets, namely a city government's email system.[26] The Commission's definition reflected the legislature's purpose — to prevent public funds from being used in a political campaign — and so was "[t]he most reasonable interpretation of the term."[27]

In this case the Commission's interpretation of "expenditure" as broader than "contract" furthers the disclosure law's purpose, which is to make money in politics transparent.[28] Timely registration and reporting allow the agency to correct potential violations and the public to evaluate candidates before going to the polls. As the superior court recognized: "If there was no requirement to report debts, parties expending

---

[24] *Id.* at 617.

[25] *See id.* at 617, 622 (stating regulations are valid if they are "consistent with and reasonably necessary to implement the statutes authorizing their adoption" and upholding the soft money disclosure regulation because it "implements the act by aiding in its enforcement, deterring evasions, and informing the public").

[26] 426 P.3d 890, 896 (Alaska 2018) (interpreting "money" as used in AS 15.14.145, which prohibits government entities and personnel from using government money to influence elections of state or municipal officials).

[27] *Id.*

[28] *See Libertarian Party of Alaska, Inc.*, 101 P.3d at 622 (describing "campaign finance disclosure requirements" as "intended to inform the electorate, deter actual corruption and avoid the appearance of corruption, and aid in the detection of violations of contribution and expenditure limits").

resources on a political campaign could wait until after the election to pay expenses and report them then. This would defeat the purpose of having campaign finance disclosure laws . . . ." The statute and the Commission's regulations thus require disclosure of debts, contributions, and expenditures when they are created, changed, or cancelled.[29]

RGA claims that this "overbroad" reporting requirement would frustrate the statute's purpose by "threatening to distort the public's understanding of what funds are or will be spent and by whom." But the Commission's regulations anticipate expenditures will change and require prompt reporting of those changes.[30] Had RGA registered with the Commission and reported the reservations in April, then reported the transfer of reservations in August, it is unclear how voters would have been confused or made less informed by access to this information. Instead, they would have learned that RGA planned to support the eventual gubernatorial candidate and had secured $1.5 million in reservations for this purpose. Later voters would have learned that FFAF was the beneficiary of RGA's efforts. This is precisely the sort of transparency the disclosure laws are intended to achieve.

RGA next argues that the Commission's interpretation of "expenditure" would allow it to arbitrarily and selectively investigate all private negotiations and crafting of political strategy. This concern lacks support in the record. The Commission's regulations and manuals clarify that expenditures include both paid and incurred expenditures; they require expenditures to be reported when the deal in question

---

[29]     *See* AS 15.13.040 (requiring reporting of contributions and expenditures); 2 AAC 50.321(g) (requiring prompt amendments to reports).

[30]     2 AAC 50.321(g).

-11-                                                                                    **7522**

is made, instead of when the expenditure is invoiced or paid.[31] This interpretation has been consistent since at least 2011 when the Commission last updated its manual, and RGA points to no inconsistencies or abuses in its application.

We conclude that the Commission's interpretation of "expenditure" to include promises or agreements that are not contractually binding is the most reasonable in light of our precedent, statutory text, and legislative intent.[32] We therefore affirm the superior court's decision on this point.

**B.      The Commission's Findings Were Supported By Substantial Evidence.**

Having accepted the Commission's interpretation of "expenditures" to be broader than "contracts," we conclude substantial evidence supports its finding that RGA's media reservations and RGA's engagement of Pinpoint both constituted expenditures. We thus affirm the superior court's decision on this issue as well.

**1.      The media reservations were expenditures.**

RGA argues that the reservations did not constitute an agreement because they were preliminary in nature — more akin to a budgeting decision or an "intention to expend." It points to the few reservations that were cancelled, as well as the transfer of

---

[31]      *See* ALASKA PUB. OFFICES COMM'N., CANDIDATE CAMPAIGN DISCLOSURE MANUAL 29 (2011) ("The date that an implied or express promise to pay for goods or services is made is the date to be used for reporting purposes."); 2 AAC 50.321(c) (requiring group entities to report as required by AS 15.13.040(b) and (c) and non-group entities to report as required by AS 15.13.040(j)); *see also* AS 15.13.040(b)(3) (requiring group entities to report "all expenditures made, incurred, or authorized"), (j)(4) (requiring non-group entities to report "all expenditures made, incurred, or authorized").

[32]      *See Eberhart*, 426 P.3d at 896 (citing legislative intent in determining Commission's interpretation was the most reasonable); *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1231 (Alaska 2003) (adopting "the rule of law that is most persuasive in light of precedent, reason, and policy" in de novo review (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979))).

the reservations to FFAF, which eventually paid the media companies, as proof that no true agreement between RGA and the media companies existed. But later changes or cancellations do not negate the existence of an agreement — the Commission's rules anticipate them. Organizations must report expenditures when made; if they are subsequently changed, the changes must be reported to the Commission as well.[33]

Substantial evidence shows the reservations were not simply budgeting decisions. The record supports a conclusion that all parties expected the reservations to be effectuated, as most of them were. The Commission considered witness testimony that television stations take reservations "very, very seriously." The media consultant RGA engaged to place reservations with several media companies could only expect to be paid if the reservations were finalized. The agreements with media companies identify prices, times, and dates for the advertisements to run. These were not internal budgeting decisions. They were agreements with third parties to purchase something of value, even if the agreements were not yet legally binding.[34]

And the reservations themselves had value. RGA now claims that by making the reservations it was merely "shaking a big fist" and letting it be known that RGA had money to invest, but even this claim admits the reservations had some value. Furthermore, RGA invested the time and effort to hire a media consultant and secure its desired time slots. By doing so, as RGA claimed in its press release, it "ensur[ed] [its] resources will be the most efficient on the field." Witness testimony supports the Commission's argument that by removing advantageous time slots from the market,

---

[33]     2 AAC 50.321(g).

[34]     *See* AS 15.13.400(6)(A) (defining an expenditure to include a "promise or agreement to purchase or transfer money or anything of value").

RGA denied its opponents access to them. RGA then transferred this valuable benefit to FFAF.

Expenditures are "promise[s] or agreement[s] to purchase or transfer money or anything of value."[35] Substantial evidence supports the Commission's finding that the reservations were agreements or promises, that they had value, and that RGA made them for the purposes of influencing an election. We thus conclude that RGA's reservations constituted expenditures.

### 2. Engaging Pinpoint Media's services was an expenditure.

RGA claims that because it never paid Pinpoint, Pinpoint's work could not have led to an expenditure. This again conflicts with the Commission's interpretation of expenditures as reportable when an agreement is made, not when the debt is invoiced or paid. And by RGA's logic, engaging a media consultant would rarely be reportable, as it is industry practice for consultants to be paid on commission.

RGA argues that "[t]here is no evidence that the RGA and [Pinpoint] had made any promise or agreement for payment or future payment from the RGA." But witness testimony shows that Pinpoint performed a valuable professional service for which it would expect a standard commission of $200 to $225,000. Many of RGA's reservation sheets expressly calculate a 15% commission for Pinpoint on the sale. Pinpoint's work for RGA in Alaska began well before Dunleavy was identified as the general-election candidate or the reservations were transferred to FFAF. It is reasonable to assume that Pinpoint expected something of value in return for its services.[36]

---

[35] AS 15.13.400(6)(A).

[36] Indeed, Pinpoint did seem to receive something of value in return for its services. Only one day after Pinpoint effectuated the transfer of the media reservations to FFAF, RGA contributed $400,000 to FFAF. That same day, FFAF paid $380,900 to

(continued...)

We conclude that substantial evidence shows the existence of an agreement between RGA and Pinpoint and that this agreement constituted an expenditure. We therefore affirm the superior court's decision on this issue.

## C. RGA Is Not Exempt From Registration.

Finally, RGA asserts that because it is not a "group," it need not register with the Commission prior to making expenditures.[37] It insists Walker-Mallott conceded this at a preliminary hearing. These claims find no support in the record or the statute in question.[38]

RGA alleges Walker-Mallott "specifically conceded that the [Commission] would have to set a new precedent" to find that RGA must register with the Commission. But Walker-Mallott only urged the Commission to "set a precedent" by granting the matter expedited review. Walker-Mallott also stated that "[the Commission] needs to set the precedent" that political organizations "should play by all the rules." Despite this rhetoric, we conclude that requiring political organizations to follow the law is not unprecedented.

Under the registration statute, any "person other than an individual" must register before making expenditures.[39] A "person" may be a group or a "nongroup

---

[36]    (...continued)
Pinpoint for "TV Media Production" and "Media Placement in [the] Anchorage Market."

[37]    RGA claims a recent Commission staff report supports its argument. But the staff report addresses only when an entity can be required to register "as a group." The report actually contradicts RGA's claim, stating that "AS 15.13.050 simply requires registration before expenditure — it does not specifically require registration as a group."

[38]    *See* AS 15.13.050(a) (requiring any "person other than an individual" to register before making expenditures).

[39]    AS 15.13.050(a). RGA does not claim to be an "individual," elsewhere
(continued...)

-15-                                                        **7522**

entity."[40]  A "person" is statutorily defined as including "a corporation, company, partnership, firm, association, organization, . . . or society."[41]  Regardless of whether RGA is a "group," it is certainly a "person" under this definition.  Therefore, RGA was subject to the registration statute's requirements.  We thus affirm the superior court's decision that RGA is not exempt from registration.

## V.    CONCLUSION

We AFFIRM the superior court's decision affirming the Commission's order assessing a fine against the Republican Governors Association.

---

[39]    (...continued) defined as "a natural person."  AS 15.13.400(11).

[40]    AS 15.13.400(14) (defining "person" as having "the meaning given in AS 01.10.060" and including "a labor union, nongroup entity, and a group").

[41]    AS 01.10.060(8).